IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | |
| MIGUEL REGALDO JIMENEZ, et al. | : | NO. 17-019-1 & 2 |
| | : | |

MEMORANDUM

Tucker, J.                                                                                                                                                                      January __19____, 2018

        Before the Court are Defendants Luis Paulino-Baez and Miguel Regaldo Jimenez's Motions to Suppress Evidence Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(c) (Docs. 45 and 46) and the Government's Response in Opposition to Defendant[s'] Motion[s] to Suppress Evidence (Doc. 47). Upon consideration of Defendants' Motions, the Government's Response thereto, and the testimony and evidence presented during the October 11, 2017 and December 1, 2017 suppression hearings before the Honorable Petrese B. Tucker, Defendants' Motions are GRANTED for the reasons set forth below.

      **I.     STANDARD OF REVIEW**

        Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides." Fed. R. Crim. P. 41(h). Federal Rule of Criminal Procedure 12 provides that suppression motions must be made prior to trial. *See* Fed. R. Crim. P. 12(b)(3)(C).

        Under the Fourth Amendment of the United States Constitution, where an individual possesses a reasonable expectation of privacy in a given area, the government must obtain a search warrant prior to searching that area. *United States v. Herrold*, 962 F.2d 1131, 1142 (3d Cir. 1992). Evidence obtained during a warrantless search is admissible at trial only if the government establishes that the search was permissible under one of the recognized exceptions

to the Fourth Amendment's warrant requirement. *Id.* In determining whether the government has met its burden to establish an exception, the Court may resolve disputed questions of fact and may consider hearsay. *See United States v. Matlock*, 415 U.S. 164, 173–75 (1974).

The Court will address each Defendant's Motion to Suppress in turn.

## II. DEFENDANT BAEZ

On November 17, 2016, while on routine patrol, Philadelphia Police Officer Michael Vargas observed a parked 2006 Jeep Cherokee, which he suspected contained an aftermarket compartment.[1] Officer Vargas exited his patrol vehicle, approached the Jeep Cherokee, kneeled down, and inspected the vehicle's undercarriage. Officer Vargas's suspicion was confirmed; the vehicle contained an aftermarket compartment.

The next day, Officer Vargas, Philadelphia Police Detective Lawrence Henry, and approximately six other law enforcement personnel conducted surveillance of the Jeep Cherokee. (Mot. to Suppress Hr'g Tr., 22:21–25, Oct. 11, 2017.) After nine hours of surveillance, Defendants Luis Paulino-Baez and Miguel Regaldo Jimenez entered the Jeep Cherokee. (Mot. to Suppress Hr'g Tr., 22:19, Oct. 11, 2017.) Det. Henry observed Defendant Jimenez climb between the front passenger seat and the driver's seat and into the cargo area of the vehicle while Defendant Baez disappeared under the dashboard of the vehicle. (Mot. to Suppress Hr'g Tr., 126:6–127:1, Oct. 11, 2017.)

After five minutes, Defendants Baez and Jimenez switched positions; Baez went into the rear cargo area of the vehicle while Jimenez disappeared under the dashboard. (Mot. to Suppress Hr'g Tr., 127:1, Oct 11, 2017.) This configuration lasted for an additional five minutes, after which Baez entered the front passenger seat and Jimenez entered the driver's seat. The two had a

---

[1] An aftermarket compartment is a hidden storage container that is placed on a car after the car has been manufactured and sold.

five-minute conversation before driving away. (Mot. to Suppress Hr'g Tr., 127:21–25, Oct. 11, 2017.)

Defendants drove the Jeep Cherokee around the corner, exited the vehicle, and got into two separate vehicles. Baez entered a silver Ford Escape while Jimenez entered a white Ford Transit. (Mot. to Suppress Hr'g Tr., 129:9–11, Oct. 11, 2017.) Det. Henry returned to the Jeep Cherokee to continue surveillance while Officer Vargas followed the Ford Escape driven by Baez. Officer Vargas eventually pulled Baez over for following too closely behind another vehicle. (Mot. to Suppress Hr'g Tr., 27:19-28:5, Oct. 11, 2017.)

After pulling Baez over, Officer Vargas instructed Baez to gather his license, registration, and proof of insurance and come to the rear of Baez's vehicle. (Mot. to Suppress Hr'g Tr., 29:21–23, Oct. 11, 2017.) Officer Vargas noticed that the registration and insurance were in the name of Carmen Hernandez and asked Baez to identify the registered owner of the vehicle. According to the registration, Baez and Hernandez had the same address, yet Baez was unable to identify Hernandez as the registered owner. (Mot. to Suppress Hr'g Tr., 30:12–16, Oct. 11, 2017.) Baez explained that, as a favor to his friend, he allowed his friend's girlfriend to use his address for registration purposes. Officer Vargas observed that Baez's "hands [were] shaking, his chest [was] rising and falling." (Mot. to Suppress Hr'g Tr., 31:17–18, Oct. 11, 2017.) Based on these observations, Officer Vargas concluded that Baez was nervous.

After waiting for backup Officers Flynn and Mahoney to arrive, Officer Vargas asked Baez if he could search the vehicle for any weapons, narcotics, or large amounts of money. According to Officer Vargas, Baez stated that "the vehicle wasn't his, but [Officer Vargas] was allowed to search." (Mot. to Suppress Hr'g Tr., 34:7–10, Oct. 11, 2017.) Officer Vargas proceeded to search the vehicle beginning with the glove box, the center console, and the

passenger seat. Officer Vargas then went to the rear of the vehicle, knelt down, and inspected the undercarriage of the vehicle where he observed an aftermarket compartment. Officer Vargas then lifted up the tailgate of the Ford Escape where he noticed a floor mat that was glued down. (Mot. to Suppress Hr'g Tr., 36:5–12, Oct. 11, 2017.) Officer Vargas then handcuffed Baez and placed him in the rear of Officer Vargas's caged patrol vehicle. Officer Vargas then took his flat-head screwdriver and pried up the floor mat that was glued down. Under the mat, he observed two sandwich bags; one containing cocaine and the other containing crystal meth. (Mot. to Suppress Hr'g Tr., 37:5–14, Oct. 11, 2017.)

### A. Officer Vargas Did Not Have Probable Cause To Search Baez's Vehicle.

Before obtaining a warrant, Officer Vargas searched Baez's vehicle. The automobile exception to the warrant requirement permits officers to search an automobile where probable cause exists to believe the automobile contains contraband. *United States v. Burton*, 288 F.3d 91, 100 (3d Cir. 2002). "Probable cause exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves" to justify a reasonable person's belief that an offense has been or is being committed. *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949) (citation omitted). Probable cause is something more than mere suspicion, but less than the evidence needed to convict. *United States v. Margeson*, 259 F. Supp. 256, 263 (E.D. Pa. 1966).

The Government argues that Officer Vargas had probable cause to arrest Baez for possession of an instrument of crime as soon as Officer Vargas observed the aftermarket compartment in the Ford Escape. (Gov.'s Resp. in Opp. to Defs.' Mot. to Supress, 14.) This argument fails because Officer Vargas testified that he did not know that the Ford Escape contained an aftermarket compartment before searching the vehicle. (Mot. to Suppress Hr'g Tr.,

4

102:3–6, Oct. 11, 2017.) A vehicle may be searched without a warrant if, prior to the search, an officer possesses probable cause. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). Here, Officer Vargas placed the cart before the horse; he conducted the search before he possessed probable cause. Thus, without a warrant to search Baez's vehicle and in the absence of probable cause, Officer Vargas could only have validly searched the car if Baez provided a valid consent.

### B. Baez's Consent

Defendant Baez maintains that he never provided consent to search the Ford Escape. (Def. Baez Mem. in Supp. of Mot. Suppress, 5.) Where a warrantless search is justified on the basis of consent, the Government must demonstrate by a preponderance of the evidence that the consent was freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497 (1983). This burden "is not satisfied by showing a mere submission to a claim of lawful authority." *Id.*

The Government offered the testimony of Officer Vargas in order to establish that Baez gave consent to search the Ford Escape. In connection with this case, Officer Vargas prepared a police report in which he noted,

> Police Officer Vargas then went back to the patrol to conduct an NCIC check. At this point, backup arrived and with all my paperwork returned and asked consent to search his belonging and Luis [Baez] stated that there was nothing that he know [sic] of in the car.

(Mot. to Suppress Hr'g Tr., 108:3–7, Oct. 11, 2017.) However, Officer Vargas testified that Baez explicitly stated that Officer Vargas was allowed to search the vehicle. Officer Vargas offered no satisfactory explanation for why he did not include this statement in his report.

The Government also offered the testimony of Officer Mahoney to support its claim that Baez consented to the search of the Ford Escape; however, Officer Mahoney's testimony only casts further doubt on the veracity of Officer Vargas's testimony. Officer Mahoney testified that while she heard and observed Officer Vargas ask for consent to search the Ford Escape, she did

5

not hear Baez say, "[t]here's nothing in the car that I know of." (Mot. to Suppress Hr'g Tr., 161:15–17, Oct. 11, 2017). Further, Officer Mahoney contradicted herself. At the October 11, 2017 suppression hearing, Officer Mahoney testified that after Officer Vargas asked Baez for consent to search his vehicle, Baez stated, "It's not my vehicle, but go ahead." (Mot. to Suppress Hr'g Tr., 160:11–12, Oct. 11, 2017.) However, at the subsequent December 1, 2017 suppression hearing, Officer Mahoney was confronted on cross examination about this statement.

> Q. And do you recall testifying to this Court that you remember Mr. Baez, my client, explicitly verbally indicating yes, that the car could be searched?
>
> A. I recall consent being given. Whether it was verbally or a hand gesture, I don't recall at this moment.
>
> Q. Do you recall being specifically asked at the last hearing whether or not it was verbal or nonverbal and your response being verbal?
>
> A. I do recall, but after I thought about it. It was a year ago. I do recall consent. Again, where it was verbally or hand gesture, I can't recall.

(Mot. to Suppress Hr'g Tr., 4:1–12, Dec. 1, 2017.) After indicating that Baez verbally consented to the search of the Ford Escape, Officer Mahoney changed her testimony and indicated that she did not remember how Baez gave consent to search the vehicle. Yet, somehow, she remembers that consent was given. The Court finds Officer Mahoney's testimony incredible because it is highly unlikely that Officer Mahoney can be sure that consent was granted if she cannot even remember the manner in which consent was given—whether through words or gesture.

Finally, Officer Flynn testified that although he was present and heard Officer Vargas request consent to search, Officer Flynn does not remember Baez "responding either verbally or nonverbally" to Officer Vargas's request. (Mot. to Suppress Hr'g Tr., 12:9–11, Dec. 1, 2017.) The testimony of these three officers casts serious doubt as to whether consent was given to

6

search the Ford Escape. The Government has not met its burden of establishing by a preponderance of the evidence that consent was freely and voluntarily given.

### C. Officer Vargas's Search Exceeded The Scope Of Baez's Alleged Consent.

Even if the Court found that Baez provided consent to search the Ford Escape, Officer Vargas's search would have exceeded the scope of that consent. "When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization." *Walter v. United States*, 447 U.S. 649, 656 (1980). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

Applied to this case, the inquiry is whether a reasonable person would have understood the exchange between Officer Vargas and Baez as indicating that Baez's authorization to search the vehicle included permission to use a flat-head screwdriver to pry up the carpeting. We, therefore, examine the alleged exchange between Officer Vargas and Baez to determine what a reasonable person would have understood the scope of the consent to be.

Before conducting the search, Officer Vargas informed Baez that he wanted to search the vehicle for weapons, narcotics, and large amounts of money. (Mot. to Suppress Hr'g Tr., 34:7–8, Oct. 11, 2017.) "And at that point he said to me that the vehicle wasn't his, but I was allowed to search." (Mot. to Suppress Hr'g Tr., 34:9–10, Oct. 11, 2017.) Officer Vargas then entered the vehicle and searched the glove box and the center console. He did not find any contraband. Next, Officer Vargas inspected the rear undercarriage of the Ford Escape and noticed an aftermarket compartment. He lifted up the tailgate of the vehicle and attempted to lift up the rear floor mat,

7

but noticed that it was glued down. Officer Vargas then took his flathead screwdriver and pried up the floor mat. (Mot. to Suppress Hr'g Tr., 37:5–15, Oct. 11, 2017.) Without warning Baez, Officer Vargas ripped up the entire floor mat. (Mot. to Suppress Hr'g Tr., 111:23, Oct. 11, 2017.)

In *Jimeno*, the Supreme Court reasoned that "breaking open" or damaging a briefcase during a search would go beyond the scope of a suspect's consent. *See Jimeno*, 500 U.S. at 251–52. This is consistent with the widely-accepted principle that general consent "to search does not include permission to inflict intentional damage to the places or things to be searched." *United States v. Torres*, 32 F.3d 225, 231–32 (7th Cir. 1994) (citation omitted).[2] In keeping with this principle, the Court concludes that a reasonable person would not interpret Baez's alleged consent to extend to searches that would entail ripping up the carpeting in the vehicle. Therefore, Officer Vargas's search exceeded the scope of Baez's alleged consent.

### III.   DEFENDANT JIMENEZ

After discovering the drugs in Baez's vehicle, Officer Vargas used his police radio to communicate with Det. Henry who informed Officer Vargas that Jimenez had returned to the

---

[2] *See United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) (citing *Jimeno* and stating in dicta that "[a] reasonable person likely would have understood his consent to exclude a search that would damage his property"); *United States v. Osage*, 235 F.3d 518, 521 (10th Cir. 2000) (noting that the "Supreme Court and this court have previously stated that a general consent to search a particular area is reasonably understood to extend to a search of containers within that area that could contain contraband . . .," but "[w]e do not read that authority to permit the destruction of such containers"); *United States v. Ibarra*, 965 F.2d 1354, 1358–59 (5th Cir. 1992) ("It is obvious to us that citizens will have greater incentives to permit consensual searches of their property if they have some assurance that law enforcement officers will respect their premises while conducting such searches. The community's interest in encouraging consent would not be advanced by interpreting [defendant's] simple assent to the search of the house to include consent to break forcibly into the sealed attic space with a sledgehammer."); *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979) (consent to search did not authorize officers to pry open car trunk), *amended* 610 F.2d 648 (9th Cir. 1979); *United States v. Washington*, 739 F. Supp. 546, 550 (D. Or. 1990) (consent given to search trunk did not authorize removal of car seats to conduct search when proper key could not be located); *State v. Arroyo-Sotelo*, 884 P.2d 901, 905 (Or. Ct. App. 1994) (broad consent given by defendant to search for narcotics and cash did not authorize officers to remove screws and pry panel from sidewall of car).

Jeep Cherokee and drove away. Officer Vargas directed Officers Flynn and Mahoney to assist Det. Henry. (Mot. to Suppress Hr'g Tr., 38:24–39:1, Oct. 11, 2017.)

Det. Henry pursued Jimenez in an unmarked vehicle which was not equipped with police lights or sirens. (Mot. to Suppress Hr'g Tr., 132:1–9, Oct. 11, 2017.) However, Det. Henry testified that when he turned on his headlights, Jimenez immediately drove away in excess of 70 miles per hour for approximately one minute. Jimenez then parked the Jeep Cherokee and fled on foot. (Mot. to Suppress Hr'g Tr., 135:12–25, Oct. 11, 2017.) Det. Henry parked his vehicle behind the Jeep Cherokee, exited his vehicle, and initially pursued Jimenez on foot. (Mot. to Suppress Hr'g Tr., 135:21–22, Oct. 11, 2017.) However, after losing sight of Jimenez, Det. Henry decided to return to the Jeep Cherokee. Det. Henry provided a description of Jimenez over the citywide Philadelphia Police radio. Soon after, Det. Henry was informed that a male fitting the description that Det. Henry had provided was arrested by an off-duty police officer. Det. Henry arrived at the location where the arrest was made and positively identified Jimenez.

For approximately one hour and forty minutes Jimenez was in police custody as officers waited for a canine unit to arrive. (Mot. to Suppress Hr'g Tr., 73:3–7, Oct. 11, 2017.) Both the Jeep Cherokee and the Ford Escape were exposed to a canine dog, which gave a positive alert to the odor of narcotics. The vehicles were then taken to "a narcotics strike force headquarters where they were secured for a search and seizure warrant." (Mot. to Suppress Hr'g Tr., 42:18–20, Oct. 11, 2017.) At 12:05a.m., approximately seven hours after Jimenez's arrest, both vehicles were searched pursuant to a search warrant. Narcotics were found in both vehicles. (Mot. to Suppress Hr'g Tr., 43:6–8, Oct. 11, 2017.)

9

### A. The Evidence Against Jimenez Must Be Suppressed Because Jimenez Was Unlawfully Arrested Prior To The Search.

Defendant Jimenez argues that the evidence against him should be suppressed because the evidence was obtained following an unlawful arrest. The Government urges this Court to apply a reasonable suspicion standard to determine whether, following the discovery of narcotics in Baez's vehicle, "Det. Henry possessed a sufficient basis to detain Defendant Jimenez until a K-9 could be exposed to the Jeep Cherokee." (Gov.'s Resp. in Opp. to Defs.'s Mot. to Supress, 15.) Contrary to the Government's position, the probable cause standard is the proper standard for determining whether officers justifiably seized Jimenez.

The proper inquiry is not whether Det. Henry had a sufficient basis to detain Jimenez because Jimenez was not simply detained; he was arrested. "[T]he determinative factor in assessing whether a person is under arrest[] is to consider if, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *United States v. Gonzalez-Gonzalez*, 432 F. Supp. 2d 253, 256 (D.P.R 2006) (quoting *Royer*, 460 U.S. at 491). Officer Vargas testified that, when Jimenez was located, Jimenez was not free to leave. (Mot. to Suppress Hr'g Tr., 46:5–6, Oct. 11, 2017.) In fact, Jimenez was placed in handcuffs and placed in the back of a police vehicle. Therefore, it is clear that Jimenez was under arrest. Accordingly, the officers needed probable cause to arrest Jimenez.

The record before the Court demonstrates that the officers did not possess probable cause to arrest Jimenez. In the case of a warrantless arrest, the police have the burden of demonstrating its validity. *Beck v. Ohio*, 379 U.S. 89, 97 (1964). In order to justify a warrantless arrest, an officer must possess probable cause that the arrestee has committed a crime. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

Here, the testimony establishes that Jimenez had not committed any crime before he was arrested. Det. Henry was asked, "What criminal offense did Mr. Jimenez commit prior to being arrested?" Det. Henry replied, "None." (Mot. to Suppress Hr'g Tr., 146:24–147:1, Oct. 11, 2017.) The Government suggests that the presence of suspected narcotics in Baez's vehicle provided the proper justification for Jiminez's seizure. The Court disagrees. In *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), the United States Supreme Court stated that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." The Supreme Court further explained, "Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another . . . ." *Id.*

The Government asks this Court to hold that a defendant may be arrested for drugs found in another individual's vehicle simply because the defendant was seen together with that other individual in a vehicle containing an aftermarket compartment. The Court declines the Government's invitation. Jimenez was never seen in the Ford Escape, which Baez was driving. In addition, Defendants were never seen exchanging any items. Thus, officers had no reasonable basis for attributing the drugs found in Baez's vehicle to Jimenez.[3] Because officers did not have

---

3   The Government suggests that officers had probable cause to arrest Jimenez for possessing an instrument of crime; namely, the aftermarket compartment in the Jeep Cherokee. (Gov.'s Resp. in Opp. to Defs.' Mot. to Suppress, 17.) In *United States v. Caraballo*, the defendant was a passenger in a vehicle that was pulled over for speeding. 104 F. App'x 820, 821 (3d Cir. 2004). The state trooper who pulled the vehicle over noticed that the driver provided a California driver's license, but the vehicle was registered to a New York resident. The defendant explained that the vehicle belonged to his aunt in New York. "He further explained that she had driven the vehicle from New York to California and flown back, and he was driving it back to New York to see a doctor for a gun-shot wound and would later fly back to California." *Id.* After

probable cause to arrest Jimenez, the evidence recovered following Jimenez's arrest must be suppressed.

## IV. CONCLUSION

The Court acknowledges and appreciates the important role that law enforcement officers play in upholding the laws of this nation. However, the Court also acknowledges that, in some cases, while diligently and zealously performing their duties, law enforcement officers sometimes overstep constitutional bounds. This is one such case. For the reasons set forth above, Defendants' Motions are GRANTED. An appropriate order follows.

---

visually inspecting the exterior of the vehicle, the trooper noticed an aftermarket compartment underneath the vehicle. *Id.* The defendant was arrested without a warrant for possession of an instrument of crime. *Id.* The Third Circuit held that the trooper had probable cause to arrest the defendant for possession of an instrument of crime. *Id.* at 822.

    In the present case, Jimenez was not arrested for possessing an instrument of crime. Det. Henry admitted that Jimenez was not arrested for any crime. (Mot. to Suppress Hr'g Tr., 146:24–147:1, Oct. 11, 2017.) Further, Officer Vargas testified that there are vehicles that are being lawfully driven in Philadelphia that contain aftermarket compartments because once the City confiscates vehicles containing aftermarket compartments, the compartments are sealed and resold at auction. (Mot. to Suppress Hr'g Tr., 54:15–20, Oct. 11, 2017.) Therefore, officers could not have had probable cause to arrest Jimenez for possessing an instrument of crime until officers verified that the compartment had not been sealed. However, the record before the Court establishes that Jimenez was arrested prior to officers ever confirming whether the compartment had been sealed. Because the officers did not have probable cause to arrest Jimenez pending the search of the Jeep Cherokee, the drugs obtained pursuant to that search must be suppressed.